# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**COREY LESAGE,**

                              **Plaintiff,**

**-vs-**                                              **Case No.  6:05-cv-1335-Orl-22KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

                              **Defendant.**

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

        This cause came on for consideration without oral argument on the complaint filed by

Corey LeSage, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

(SSA).  Doc. Nos. 10, 11.  This matter has been referred to me for issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b) and Middle District of Florida Local Rule

6.01(c)(21).

**I.      PROCEDURAL  HISTORY.**

        In October 2002, LeSage applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the

Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381,

*et seq*., (sometimes collectively referred to herein as the Act).  R. 45-47, 247-50.[1]  The applications

alleged that LeSage became disabled on November 1, 1999.  *Id*.  LeSage's applications were

denied initially and on reconsideration. R. 28-32, 242-46.

   LeSage made a timely request for a hearing before an administrative law judge (ALJ).  R.

27.  An ALJ held a hearing on January 4, 2005.  LeSage, represented by an attorney, testified at the

hearing.  Thomas Laughman, a vocational expert (VE), also testified.  R. 256-76.

   After considering the testimony and the medical evidence presented, the ALJ determined

that LeSage was insured under OASDI through December 31, 2003.  R. 17. The ALJ found that

LeSage had not engaged in substantial gainful activity since November 1, 1999, the alleged onset

date of her disability.  *Id*.

   The ALJ concluded that the medical evidence showed that LeSage had cardiomyopathy and

valvular heart disease, and was status post mitral valve repair, which were severe impairments.  *Id*.

The ALJ also found that LeSage had mild depression.  Because it resulted in no more than mild

restrictions on activities of daily living, mild difficulties in maintaining social functioning, mild

and occasionally moderate difficulties in maintaining concentration, persistence or pace, and

involved no episodes of decompensation of extended duration, R. 15-16, the ALJ concluded that

this did not rise to the level of a severe impairment, R. 17.  These impairments did not meet or

---

   [1]  The record indicates that LeSage previously applied for benefits in 1998, with an alleged
onset date of November 1997, and that the claims were pursued only through the initial review and
reconsideration stages.  R. 11.

equal any of the impairments listed in the applicable social security regulations (the Listings).[2]  R. 18.

The ALJ found that LeSage had the residual functional capacity (RFC) to do the following: "there is no limitation with regard to sitting; [LeSage] is able to stand and/or walk a maximum of one hour each, in an 8-hour workday; [LeSage] has the [RFC] for a limited range of light work and a wide range of sedentary work." *Id*.[3]

In reaching this conclusion, the ALJ gave little weight to the opinion of Dr. Ranadive, one of LeSage's treating physicians, that LeSage was disabled due to shortness of breath.  R.  14.  The ALJ concluded that Dr. Ranadive's opinion that LeSage was disabled, and that the limitations he listed in a Medical Source Statement of Ability To Do Work-Related Activities (Physical), were "not consistent with his own treatment notes and the clinical data submitted and other evidence of record."  R. 16.  In particular, the ALJ found that "[w]hile the severity of [LeSage's] symptoms may have varied at times during the periods at issue, there is no twelve-month period during which the severity was sustained such that it precluded all significant work activity."  *Id*.

---

[2]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[3]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567, 20 C.F.R. § 416.967.  Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required and other sedentary criteria are met."  *Id*.

The ALJ also found that LeSage's testimony about the "significant, sustained limitations" arising from her impairments was not totally credible.  *Id*.  Specifically, he relied on the fact that LeSage was able to complete a wide range of activities of daily living and attend college courses. *Id*.

Based, in part, on the testimony of the VE, the ALJ concluded that LeSage could perform her past relevant work as a receptionist.  R. 17.  The ALJ further wrote that "even when presented with a hypothetical containing the more severe restrictions as opined by Dr. Ranadive . . . the vocational expert testified that the claimant could still perform her past relevant work as a receptionist."  *Id*.  Therefore, the ALJ concluded that LeSage was not disabled for purposes of the Act.  R. 18.

LeSage requested review of the ALJ's decision. R. 7.  On July 6, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 3-5. LeSage timely sought review by this Court.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied LeSage's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

### III.    STATEMENT OF FACTS.

*A.    Evidence from LeSage.*

LeSage was born December 17, 1966.  R. 259.  She was 5'4" tall and weighed 160 pounds at the time of the hearing.  R. 260.  LeSage graduated from high school and had attended some college.  R. 54, 259-60.

In April 1998, LeSage suffered a heart attack that resulted in heart muscle damage.  R. 267. She underwent heart surgery the same year.  R. 272.  Thereafter, she continued to have leaking from the mitral valve of her heart.  R. 267.  Subsequent surgery could not be done to correct the problem because of the extensive heart damage.  R. 272.  LeSage also experienced problems breathing, including palpitations when she bent over, and shortness of breath with exertion.  R. 267, 269.  She also had arthritis in her hands.  R. 270.  LeSage experienced swelling of the legs if she stood for too long.  R. 87.

LeSage previously had performed temporary secretarial work at Valencia College.  R. 49, 58, 260.  She worked part-time from 9:00 to 2:00 for approximately six months.  R. 58, 260.  In this position, she sat at the front desk, answered the telephone, and directed students.  R. 261.  She occasionally lifted up to fifty pounds, and frequently lifted up to twenty-pounds. She walked two hours, stood one hour, and sat four hours a day.  The job also required her occasionally to stoop, kneel, crouch, handle, grab or grasp big objects, and write, type or handle small objects.  R. 72. She missed work once or twice a month because of difficulties associated with her cardiac medication and cold weather, which aggravated her arthritis.  R. 265-66.

Before working at the college, LeSage had also worked as a waitress and bartender.  In a typical eight-hour day as a waitress, LeSage walked up to six hours, stood up to five hours,

climbed up to one hour, stooped up to three hours, knelt up to one hour, crouched up to two hours, crawled up to one-half hour, handled objects up to four hours, reached up to four hours, and wrote, typed, or handled small objects for up to six hours.  R. 49; *see also* R. 71, 74-75.  She occasionally lifted up to twenty pounds and frequently lifted ten pounds.  R. 49.  She also supervised other employees.  *Id*.  She also briefly worked part-time as a waitress three days per week after leaving the college.  R. 268.  She missed work occasionally because of fatigue.  R. 269.  She did not believe that she could return to these positions.  R. 261, 266-67.

At the time of the hearing, with the assistance of vocational rehabilitation, LeSage was attending school and expected to obtain an Associates Degree in administration.  R. 260-61, 270.  She attended school four days per week, for approximately two hours per day.  R. 261.  At the time of the hearing, she had a 3.9 grade point average.  R. 265.  LeSage drove herself to school.  R. 261.  While she occasionally had trouble reporting for class, she could do much of her work online, and professors were generally willing to accommodate her needs.  R. 270-71.  A letter from the Florida Department of Education indicated that LeSage was enrolled in a paralegal program and expected to graduate in May 2006, at which point the office believed she could get a job.  R. 101.

LeSage was able to perform household chores, including assisting her husband and two children.  R. 262.  It took her longer than usual to perform household chores such as vacuuming, putting sheets on beds, or carrying laundry, due to difficulty breathing.  R. 78, 270.  She could not perform yard work or gardening.  R. 79.  She could go shopping for groceries and other supplies, and could cook meals.  R. 83.  She could manage household funds, and was not limited in bathing or dressing.  R. 84.  Cold or rainy days made her hands stiff.  R. 270.  Difficulty breathing also interfered with her sleep.  R. 78.

She drove one of her children to school three days per week, and the other child took the

bus.  R. 262.  Her husband coached a little league team, and LeSage was the team mom.  *Id*.  As

such, she made telephone calls and prepared the snack list.  *Id*.  She had responsibilities in this

capacity three or four days per week.  R. 263.  She also drove her son to games three to four times

a week.  *Id*.

For about a year, LeSage participated in a low-impact exercise program for women.  *Id*.

However, she stopped going because of arthritis.  *Id*.

At the time of the hearing, LeSage took Coric,[4] Corzaan,[5] Lasix,[6] and aspirin.  *Id*.  She had

previously taken Celebrex[7] for arthritis.  *Id*.  She had previously taken Xanax[8] for anxiety.  R. 53.

As a side effect of the Lasix, LeSage frequently had to use the restroom.  R. 264.  This resulted in

---

[4]  Coric is the brand name for lisinopril, an angiotensin-converting enzyme (ACE) inhibitor, and is prescribed in the treatment of high blood pressure and heart failure.  Medline Plus, *Lisinopril*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html (last visited Jan. 9, 2007).

[5]  Corzaan is the brand name for losartan, an angiotensin II receptor antagonist, and is prescribed in the treatment of high blood pressure and congestive heart failure.  Medline Plus, *Losartan*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695008.html (last visited Jan. 9, 2007).  It is also known as Cozaar.  *Id*.

[6]  Lasix is the brand name for furosemide, a "water pill," and "is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease."  Medline Plus, *Furosemide*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682858.html (last visited Jan. 9, 2007).

[7]  Celebrex is the brand name for celocoxib, a nonsteroidal anti-inflammatory drug in a group called a COX-II inhibitor, and is prescribed in the treatment of pain associated with osteoarthritis.  Medline Plus, *Celecoxib*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699022.html (last visited Jan. 9, 2007).

[8]  Xanax is the brand name for alprazolam, and is prescribed in the treatment of anxiety and panic attacks.  Medline Plus, *Alprazolam*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html (last visited Jan. 9, 2007).

leaving class sometimes, and in trouble sleeping through the night.  *Id*.  The other medications

lowered her blood pressure such that she had to eat about an hour before being able to drive.  *Id*.

     B.    *Vocational Expert Testimony.*

Based on her testimony, the VE classified LeSage's work at the college as a receptionist,

DOT 237.367-038, which is sedentary, semi-skilled work; her past work as a waitress as DOT

311.1477-030, which is light, semi-skilled work; and her past work as a bartender as DOT 312-

474.010, which is light, semi-skilled work.  R. 273.

The ALJ posed the following hypothetical question to the VE:

> Assume . . . an individual between the ages of 32 and 38 with a high school
> education and assume that they were restricted to limited light and full sedentary
> [RFC].  Assume that there was no particular limitations on sitting.  Assume that
> their maximum standing at one time would be an hour max, walking an hour max.
> Assuming that the person . . . would not have a job that would require them to stand
> more than an hour at any one time or . . . walk more than an hour, they might stand
> for 15, 20 minutes, 45, but they'd never be required to stand more than an hour or
> walk more [than] an hour at a time, would there be any reason . . . the person
> couldn't do a receptionist job as is normally performed in the economy?

R. 273-74.  The VE responded that such a claimant could perform a receptionist job as that job is

normally performed in the economy.  R. 274.

LeSage's attorney added the following limitations to the hypothetical: "no bending,

stooping, crouching, crawling, . . . [or] balancing."  *Id*.  The VE opined that these limitations

would not affect the claimant's ability to perform the receptionist job.  *Id*.

LeSage's attorney then added a limitation against lifting even five pounds because of

shortness of breath.  R. 275.  Based on this additional restriction, the VE opined that the person

could limit the claimant's ability to work as a receptionist.  *Id*.

C.     *Medical Records.*

In April 1998, LeSage experienced a myocardial infarction (heart attack).  R. 137, 188.

She underwent angioplasty and stenting of the coronary artery.[9]  R. 188.

In May 1998, LeSage was admitted to the hospital for shortness of breath and difficulty

sleeping.  R. 137.  Nandkishore Ranadive, M.D., observed moderate to moderately severe mitral

regurgitation[10] and impaired left ventricular systolic function.[11]  R. 139.  R. Kendall Smith, M.D.,

also observed "paroxysmal nocturnal dyspnea[12]/questionable mild congestive heart failure" and

low blood pressure.  R. 134-35.

---

[9]   Angioplasty refers to a surgery in which a small balloon is inflated inside a blood vessel to widen it.  A stent is a tiny mesh tube that supports the artery walls to keep them open.  Society for Vascular Surgery, *Angioplasty and Stenting*, http://www.vascularweb.org/ _CONTRIBUTION_PAGES/Patient_Information/NorthPoint/Angioplasty_and_Stenting.html (last visited Jan. 9, 2007).

[10]   Mitral regurgitation "is a disorder in which the heart's mitral valve suddenly does not close properly, causing blood to leak (back-flow) into the left atrium (upper heart chamber) when the left ventricle (lower heart chamber) contracts."  Its symptoms include rapid breathing, shortness of breath, palpitations, chest pain, and cough.  Medline Plus, *Mitral regurgitation – acute*, http://www.nlm.nih.gov/medlineplus/ency/article/000177.htm (last visited Jan. 9, 2007).

[11]   This impaired systolic function was reflected in an ejection fraction of 35%.  R. 139. The ejection fraction refers to the amount of blood pumped out of the heart during each beat or contraction.  A healthy ejection fraction is frequently between 55% and 70%.  Mayoclinic.com, *Ejection fraction: What does it measure?*, http://www.mayoclinic.com/health/ejection-fraction/ AN00360 (last visited Jan. 9, 2007).

[12]   Paroxysmal nocturnal dyspnea, PND, "is an abnormal condition in which a person must keep the head elevated (by sitting or standing) to be able to breathe deeply or comfortably, or is awakened suddenly during the night feeling short of breath . . . ."  Medline Plus, *Breathing difficulty – lying down*, http://www.nlm.nih.gov/medlineplus/ency/article/003076.htm (last visited Jan. 9, 2007).

In June 1998, LeSage was admitted to the hospital for cardiac catheterization and mitral valve repair surgery.  R. 103-08, 122-33.  Her discharge diagnoses included "severe mitral regurgitation status post mitral valve repair surgery;" ischemic cardiomyopathy[13] with ejection fraction of 30%; status post coronary angioplasty and stent of the coronary artery, with stenosis[14] at the stent site; as well as impaired left ventricular systolic function.  R. 103, 126.

In July 1998, LeSage presented at the hospital complaining of shortness of breath.  R. 114-21.  Harold Greenburg, whose qualifications are not indicated, noted that the echocardiogram was abnormal.  R. 121.  L. Joseph Colvin, M.D., observed mild cardiac enlargement.  R. 120.

In January 2000, LeSage was seen by Dr. Ranadive.  She reported feeling "OK" but experiencing occasional nonexertional chest pain with shortness of breath.  R. 199.  In December 2000, LeSage was seen by Dr. Ranadive for arthritic symptoms and fatigue.  She did not report shortness of breath during this visit.  Dr. Ranadive prescribed Vioxx.[15]  R. 198.

In February 2002, LeSage was seen for follow up by Dr. Ranadive.  She did not report chest pain or shortness of breath.  Dr. Ranadive adjusted her medications.  R. 197.

---

[13]  Ischemic cardiomyopathy refers to congestive heart failure due to coronary artery disease and relates to insufficient blood and oxygen in the heart.  Its symptoms include chest pain, palpitations, irregular or rapid pulse, shortness of breath, cough, fatigue, decreased alertness, and difficulty breathing.  Medline Plus, *Ischemic cardiomyopathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000160.htm (last visited Jan. 9, 2007).

[14]  Stenosis refers to a narrowing of a blood vessel.  STEDMAN'S MEDICAL DICTIONARY 1673 (26th ed. 1995) (hereinafter STEDMAN'S).

[15]  Vioxx is the brand name for rofecoxib, a nonsteroidal anti-inflammatory drug in a group called a COX-II inhibitor, and is prescribed in the treatment of pain associated with osteoarthritis.  It was withdrawn from the market for concerns of increased risk of cardiovascular events.  Medline Plus, *Rofecoxib*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699046.html (last visited Jan. 9, 2007).

In March 2002, LeSage underwent an exercise stress echocardiogram.  She completed the exercise test successfully without chest pain. The conclusion was moderate mitral regurgitation, normal heart rate and blood pressure response to exercise, and average exercise capacity.  Dr. Ranadive concluded that LeSage remained a candidate for continued medical therapy.  R. 195-96.

In June 2002, LeSage was seen by Dr. Ranadive for occasional angina (chest pain). LeSage did not complain of shortness of breath during this examination.  The impression was moderate mitral regurgitation.  She was directed to continue her exercise and diet regime.  R. 194.

An echocardiogram taken in September 2002 "reveal[ed] moderately severe mitral regurgitation," hypokinesia,[16] and moderately impaired left ventricular systolic function with an ejection fraction of 35%.  R. 192-93.

In October 2002, Dr. Ranadive saw LeSage for increased exertional dyspnea (shortness of breath).  His impression was symptomatic mitral regurgitation and ischemic cardiomyopathy, as well as history of mitral valve replacement.  R. 191.

In January 2003, Dr. Ranadive wrote a letter to the state agency in which he stated that LeSage "did well up until about 1 year ago when she has now begun experiencing progressive shortness of breath," related to her mitral valve insufficiency.  He indicated that further surgery was likely necessary.  He then concluded, "[i]n my opinion, [LeSage] is currently disabled due to her shortness of breath as a result of her cardiac condition."  R. 188-89.  Progress notes from the same month indicate chest pain and shortness of breath, progressive mitral regurgitation, and history of mitral valve repair.  R. 190.

---

[16]  Diminished or slow movement.  STEDMAN'S at 836.

In April 2003, LeSage underwent a graded exercise treadmill test at the request of the state agency. She completed the first stage and recovery, but the second stage was stopped because of shortness of breath. Nevertheless, she reached 5.8 METS of maximum workload.[17] Sam Ranganathan, M.D., did not observe indicia of ischemic heart disease. He also concluded that the study was inconclusive and needed clinical correlation. R. 146.

It appears that LeSage had a second cardiac catheterization in April 2003, but the records of the procedure are not in the file. Dr. Ranadive reported that this procedure "revealed evidence of severe left ventricular systolic dysfunction with an ejection fraction of less than 30% with moderate mitral regurgitation. It was felt that her main symptoms were due to progressive dilatation of her left ventricle with evidence of a dilated cardiomyopathy." *See* R. 222.

In May 2003, LeSage was seen, apparently by Dr. Ranadive, for weight gain and shortness of breath. R. 187.

In July 2003, LeSage was seen for occasional feelings of lightheadedness and fatigue, and for episodic palpitations. R. 186. There were no complaints of chest pain or shortness of breath. *Id*. Dr. Ranadive sent another letter to the state agency in which he opined that based on her symptoms, LeSage fell within Class III of the New York Heart Association classification.[18] R.

---

[17] "METs stands for 'metabolic equivalents.' Different activities are given different MET levels depending on how much energy they take to do." Am. Acad. of Family Physicians, *Heart Attack: Getting Back Into Your Life After a Heart Attack*, side bar, http://familydoctor.org/002.xml (March 2005). Playing tennis is an example of an activity requiring 6 METs. *Id.*

[18] The New York Heart Association Functional Classification classifies patients based on their physical functional capacity. Class III includes "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Am. Heart Ass'n, *Classification of Functional Capacity and Objective Assessment*,

222.  He concluded, "[i]n my opinion, [LeSage] is permanently disabled from a cardiac standpoint."  *Id*.

Also in July 2003, Dr. Ranadive completed a Medical Source Statement of Ability To Do Work Related Activities (Physical).  R. 223-26.  He indicated that LeSage could occasionally and frequently lift and carry up to ten pounds, stand or walk for less than two hours in an eight-hour work day and sit for less than six hours in an eight-hour workday.  R. 223-24.  He indicated that she would have occasional limitations on her ability to climb and that she should never balance, kneel, crouch, crawl, or stoop.  R. 224.  She would have occasional limitations in reaching in all directions, in gross handling, and in fingering.  R. 225.  He also indicated that she should be limited from temperature extremes, noise, dust, vibration, humidity, hazards, fumes, and odors.  R. 226.

In March 2004, Javaid S. Sheikh, M.D., saw LeSage related to intermittent joint swelling, pain and stiffness in the hands, feet, ankles and knees, and occasional numbness and tingling.  Dr. Sheikh concluded the most likely diagnosis was rheumatoid arthritis, or as a differential diagnosis, inflammatory spondyloarthropathy.[19]  Dr. Sheikh directed her to cease using Aleve,[20] and started

---

http://www.americanheart.org/presenter.jhtml?identifier=4569 (last visited Jan. 9, 2007).

[19]  Spondyloarthropathy, also known as spondyloarthritis, refers to "a family of inflammatory rheumatic diseases that can affect the spine and joints, ligaments and tendons. These diseases can cause fatigue and pain or stiffness in the back, neck, hands, knees, and ankles as well as inflammation of the eyes, skin, lungs, and heart valves."  John D. Reveille, M.D., Am. Coll. of Rheumatology, *Spondyloarthritis (Spondyloarthropathies)*, http://www.rheumatology.org/public/factsheets/spondylitis_new.asp (last visited Jan. 9, 2007).

[20]  Aleve is the brand name for naproxen sodium, a nonsteroidal anti-inflammatory drug used to treat mild pain.  It is available over-the-counter.  Medline Plus, *Naproxen*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html (last visited Jan. 9, 2007).

her on Celebrex.  R. 230-31.  In April 2004, Dr. Sheikh observed no evidence of swelling and full range of motion in all joints.  R. 228-29.

In July 2004, Dr. Ranadive saw LeSage for follow up.  She stated that she "feels OK."  R. 232.  Dr. Ranadive's impressions were arteriosclerotic heart disease, dilated cardiomyopathy, mitral regurgitation, and increased cholesterol.  He recommended weight loss and exercise.  R. 232, 241.  An echocardiogram showed mildly impaired left ventricular systolic function, reduced ejection fraction, mild dilation of the left atrium, moderate mitral regurgitation, and mild tricuspid regurgitation.[21]  R. 234-35.  During a treadmill exercise test, LeSage experienced chest pain, including a burning sensation, and shortness of breath.  R. 236-37.  The test was terminated due to fatigue.  R. 237.  The conclusion was "small to moderate area of lateral infarction," ejection fraction of 45%, normal heart rate and blood pressure response to exercise, and good exercise capacity.  *Id*.  Based on the test, Dr. Ranadive concluded that LeSage remained a good candidate for continued medical therapy.  R. 238; *see also* 239-40.

In October 2004, Dr. Sheikh saw LeSage for follow up.  Dr. Sheikh wrote that "[LeSage] denied any history of significant joint pain or stiffness.  Activities of daily living were full."  Dr. Sheikh renewed his diagnosis of inflammatory arthritis most likely to be rheumatoid.  He also observed that LeSage responded extremely well to Celebrex therapy.  R. 227.

---

[21] "Tricuspid regurgitation is a disorder involving backward flow of blood across the tricuspid valve which separates the right ventricle (lower heart chamber) from the right atrium (upper heart chamber)."  Symptoms include pulsing of the neck veins, swelling throughout the body, fatigue and weakness.  Medline Plus, *Tricuspid regurgitation*, http://www.nlm.nih.gov/medlineplus/ency/article/000169.htm (last visited Jan. 9, 2007).

D.       *Reviewing Professionals.*[22]

In April 2003, Donald Warren Morford, M.D., completed a Physical Residual Functional Capacity Assessment at the request of SSA.  R. 163-70.  Dr. Morford indicated that LeSage could occasionally lift up to ten pounds, frequently lift less than ten pounds, stand at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  R. 164.  He indicated that she would occasionally be limited in climbing, balancing, stooping, kneeling, crouching, and crawling.  R. 165.  He also indicated that she should avoid concentrated exposure to extreme cold and heat, fumes and odors, and hazards including machinery and heights.  R. 167.  Otherwise, he did not observe any limitations.  He also recommended discounting Dr. Ranadive's opinion that LeSage was disabled due to shortness of breath based on the results of the stress test.  R. 169.

In August 2003, Keith R. Holden, M.D. completed another physical RFC assessment.  R. 200-07.  He reached the same conclusions as Dr. Morford with respect to the maximum amounts LeSage could lift or carry, and sit or stand during an average workday.  R. 201.  He indicated that she had no postural, manipulative, visual, or communicative limitations, but that she would need to avoid concentrated exposure to extreme cold or heat, fumes or odors, or hazards, due to cardiomyopathy.  R. 201-04.  He echoed Dr. Morford's analysis of Dr. Ranadive's letter, noting that LeSage exercised to 6 METS on a stress test.  R. 206.

---

[22]  I have not included reports concerning LeSage's mental condition, because she did not challenge the ALJ's finding that she did not have a severe mental impairment.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative

answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

 "The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

 A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

 The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

 The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.    ANALYSIS.

LeSage asserts three interrelated grounds supporting reversal: (1) whether the ALJ properly considered Dr. Ranadive's opinions; (2) whether the questions posed to the VE were sufficient; and (3) whether the ALJ properly considered LeSage's testimony. These are the only issues I will address.[23]

### A.    Consideration of Dr. Ranadive's Opinion.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary

---

[23] The parties were advised that issues not specifically raised would be considered waived. Doc. No. 12 at 2.

finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted).  The ALJ must articulate the reasons for giving less weight to the opinion of the treating physician.  *Id.*  However, because the ultimate determination of disability for purposes of the Act is reserved to the Commissioner, conclusions by a treating physician that a claimant is "disabled" are not binding on the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Miller v. Barnhart*, 182 Fed. Appx. 959, 964 (11th Cir. 2006); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1255 (M.D. Fla. 2005).

Here, the ALJ concluded that Dr. Ranadive's opinions in the July 2003 letter – that LeSage was disabled and that she fell within Class III of the New York Heart Association classification – and in the Medical Source Statement of Ability To Do Work-Related Activities (Physical), R. 223-26 (internal ex. 9F), were "not consistent with his own treatment notes and the clinical data submitted and other evidence of record."  R. 16.  In support of this proposition, the ALJ cited Dr. Ranadive's treatment notes from July 2004, R. 232-41 (internal ex. 11F).  *Id.*  The ALJ also cited the opinions by the reviewing professionals, both of whom discounted Dr. Ranadive's opinion that LeSage was disabled based on her performance in exercise stress tests.  R. 170, 206.

As an initial matter, because the ultimate determination regarding disability is reserved to the Commissioner, the ALJ was not required to give any weight to Dr. Ranadive's opinion that LeSage was disabled.  Nevertheless, because Dr. Ranadive was LeSage's primary treating physician for her cardiac problems, there must be good cause to reject Dr. Ranadive's opinions regarding LeSage's functional ability.

The July 2004 report from Dr. Ranadive does not provide good cause to support the ALJ's conclusion.  In this report, Dr. Ranadive indicated that LeSage said she "feels OK," and noted that

she had good exercise capacity.  However, in these same records, Dr. Ranadive also concluded that

LeSage had arteriosclerotic heart disease, dilated cardiomyopathy, and mitral regurgitation; an

echocardiogram showed mildly impaired left ventricular systolic function, reduced ejection

fraction, mild dilation of the left atrium, moderate mitral regurgitation, and mild tricuspid

regurgitation; and during a treadmill exercise, which was terminated due to fatigue, LeSage

experienced chest pain, including a burning sensation, and shortness of breath.   Dr. Ranadive's

conclusion that LeSage's condition fell within Class III of the New York Heart Association

Functional Classification, by definition means that LeSage would have marked limitation of

physical activity and that less than ordinary activity causes fatigue, palpitation, dyspnea or anginal

pain.  *See* n.18, *supra.*

The Commissioner argues that Dr. Ranadive's opinion was inconsistent with LeSage's

work as a waitress, attendance at college, shopping, visiting with people, driving herself, going to

the gym, acting as a team mom, and with the letter from vocational rehabilitation that indicated

LeSage should be able to get a job after completing paralegal studies.  Doc. No. 16 at 7-8.   The

evidence does not establish that LeSage performed any of these activities on the sustained basis

that would be required for full time work. Furthermore, Dr. Ranadive was aware of LeSage's

performance on some of the treadmill tests, and Dr. Ranganathan found the results of the treadmill

test he performed to be inconclusive.  Therefore, these facts do not provide good cause for

rejecting the opinion of LeSage's treating cardiologist, Dr. Ranadive.

B.    *Use of the VE's Testimony*.

LeSage argues, first, that it is always improper to consider VE testimony at step four of the

sequential evaluation process.  This argument is unavailing because the regulations specifically

permit the ALJ to consider VE at this step of the analysis.  20 C.F.R. §§ 404.1560(b)(2),

416.960(b)(2).  *See also Hennes v. Comm'r*, 130 Fed. Appx. 343, 346 (11th Cir. 2005) (finding

that the ALJ did not err in considering the testimony of a VE in determining whether the claimant

could perform her past relevant work).

LeSage also contends that the ALJ's hypothetical question to the VE did not adequately

reflect LeSage's RFC.  The law requires that the ALJ pose a hypothetical question to the VE that

includes all of the functional limitations arising from a claimant's impairments. *Phillips v.*

*Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th

Cir. 1999)).  LeSage's argument in this regard is correct.

The ALJ found that LeSage was able to stand or walk a maximum of one hour each in a

eight-hour workday.  Yet, the hypothetical question asked the VE to assume that the claimant

could stand or walk one hour at a time, not a total of one hour during the work day.

Furthermore, if Dr. Ranadive's RFC assessment is accepted, the hypothetical to the VE

was still insufficient because it did not include all of the functional limitations Dr. Ranadive

identified.  Among other things, it did not include a limitation on sitting to less than six hours per

day.  Under the SSA's interpretation of its regulations, sedentary work requires the ability to sit

about six hours in an eight-hour workday.  Soc. Sec. Rul. 96-9p, 1996 WL 374185, at *6-7.  Thus,

this limitation, as well as the postural and environmental limitations included in the RFC

assessment of Drs. Ranadive, Morford and Horton, may have been important to the VE's

determination of whether LeSage could perform her past work as a receptionist.[24]   The omission

of these functional limitations also undermines the ALJ's conclusion that "even when presented

with a hypothetical containing the more severe restrictions as opined by Dr. Ranadive . . . the

vocational expert testified that the claimant could still perform her past relevant work as a

receptionist." R. 17.

> C.      Consideration of LeSage's Testimony.

In this circuit, a claimant's assertion of disability through testimony of pain or other

subjective symptoms is evaluated pursuant to a three-part standard. This standard "'requires (1)

evidence of an underlying medical condition and either (2) objective medical evidence that

confirms the severity of the alleged pain arising from that condition or (3) that the objectively

determined medical condition is of such a severity that it can be reasonably expected to give rise to

the alleged pain.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*,

921 F.2d 1221, 1223 (11th Cir.1991)). If proof of a disability is based upon subjective evidence

and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit

such testimony or the implication must be so clear as to amount to a specific credibility finding."

*Foote*, 67 F.3d at 1562.

In this case, the ALJ found that LeSage's complaints of "significant, sustained limitations"

were not fully credible.  He cited LeSage's activities of daily living and her ability to attend school

to support his determination.  These findings are supported by substantial evidence in the record.

---

[24]  I note that the job of receptionist, as performed in the national economy, requires frequent reaching and handling.  *Dictionary of Occupational Titles* 237.367-038 Receptionist (4th ed. rev. 1991).  Dr. Ranadive opined that LeSage could only reach and perform gross handling and fingering occasionally.

As discussed above, LeSage was able to drive her children to school and to games, perform work as a team mom, attend exercise classes, and apparently successfully pursue an Associate's Degree. Accordingly, this assignment of error is unavailing.

   D.  *Award of Benefits or Remand.*

   LeSage requests that the Court order the Commissioner to pay her disability benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Here, the record does not establish disability without any doubt.  Rather, remand is required to permit the Commissioner to reconsider the RFC assessment by Dr. Ranadive.  In the event the Commissioner elects to again solicit the services of a VE, the hypothetical question to the VE must include all of the relevant functional limitations on LeSage's ability to work.

**VI.  RECOMMENDATION.**

   For the reasons stated herein, I respectfully recommend that the decision of the Commissioner be **REVERSED** and that this case be **REMANDED** to the Commissioner of the Social Security Administration for additional proceedings.  I further recommend that the Court

direct the Clerk of Court to enter judgment consistent with its decision on this Report and

Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained

in this report within ten (10) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 9, 2007.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy